# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT NASHVILLE

KNOTT'S WHOLESALE FOODS, INC. )
                                        )

      Plaintiff/Appellee )      Coffee Chancery No. 93-19

                                          )

**vs.** )

                                          )

**BILLY L. AZBELL and** )      Appeal No. 01-A-01-9510-CH-00459
**J & R FOODS, INC.** )

                                          )

      Defendants/Appellants. )

**FILED**

**December 6, 1996**

**Cecil W. Crowson**
**Appellate Court Clerk**

APPEAL FROM THE CHANCERY COURT OF COFFEE COUNTY
AT MANCHESTER, TENNESSEE

THE HONORABLE JOHN W. ROLLINS, CHANCELLOR

For the Plaintiff/Appellee:

William R. Neese
Dresden, Tennessee

Doyle E. Richardson
Manchester, Tennessee

For the Defendants/Appellants:

Lawrence D. Wilson
Nashville, Tennessee

Kline Preston
Nashville, Tennessee

John H. Norton, III
Shelbyville, Tennessee

**AFFIRMED IN PART, REVERSED IN PART
AND REMANDED**

HOLLY KIRBY LILLARD, JUDGE

CONCUR:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

**OPINION**

In this case, Defendant Billy Azbell (Azbell) appeals the trial court's order granting summary judgment in favor of Plaintiff Knott's Wholesale Foods, Inc. (Knott's), finding that Azbell breached his fiduciary duty of loyalty as an employee. The trial court issued injunctive relief against Azbell and subsequently found that Azbell and defendant J & R Foods (J & R) engaged in a civil conspiracy to circumvent the injunction. Injunctive relief was issued against Azbell and J & R, and both defendants were held liable for compensatory damages, punitive damages, and attorneys' fees. Azbell and J & R appeal. We affirm in part and reverse in part.

The facts in this case are largely undisputed. Knott's, a Tennessee corporation, is a wholesale snack food distributorship owned by Jerry Knott. Knott's distributes its snack foods primarily to convenience and grocery stores. On August 6, 1990, Knott's hired Azbell as a route salesman. Azbell was an employee at will with no employment agreement. He was never asked to sign an agreement regarding confidential information or restricting his ability to compete with Knott's in the event his employment terminated.

Azbell worked on a sales route known as Route 40 for over a year, until Knott's promoted him to district manager and replaced him on Route 40 with another route salesman. Azbell worked as district manager for approximately a year. Knott's then reinstated him as a route salesman on Route 40.

When Azbell returned to work on Route 40 as a route salesman, he became dissatisfied with his compensation and began contemplating going into business for himself, in competition with Knott's. During this time, Azbell had conversations with many of Knott's customers on Route 40 regarding whether they would buy from him if he went into business for himself. On October 4, 1992, Azbell approached J & R, a Tennessee corporation and a competitor of Knott's, and asked if J & R would be willing to supply him with merchandise for a sales route if he left Knott's and became self-employed. Jim and Rick Campbell, the owners of J & R, told Azbell that they would be able to supply him with products once he left Knott's employment.

In his deposition, Azbell admitted that, while employed by Knott's, he told customers along Route 40, "I'm going to be going into business for myself here in a couple of weeks and I would appreciate you doing some business with me." Azbell testified, "I just told some of the customers that I was going to be leaving Knott's and when I came back in a week or so, I would be in business for myself and I would appreciate them buying from me." When questioned as to whether he asked

Knott's customers to buy from him, Azbell said, "[Y]es, I did ask for their business." Usually, the customers would then ask whether Azbell would be able to provide them with the same products that Knott's provided at competitive prices. Azbell assured the customers that he would be able to provide the same products at the same prices. Azbell stated that he felt "fairly confident" they would do business with him.

On Sunday, October 11, 1992, Azbell terminated his employment with Knott's. On the following day he went into business for himself, calling on many of Knott's former customers with products supplied to him by J & R. Immediately thereafter, Knott's lost to Azbell approximately two-thirds of its customers and business on Route 40. Knott's then filed a lawsuit against Azbell, alleging that he breached his fiduciary duty of loyalty as an employee by wrongfully soliciting its customers during his employment. In its complaint, Knott's sought injunctive relief, compensatory damages, and punitive damages. After a hearing, the trial court issued a temporary injunction against Azbell, prohibiting him from soliciting those customers on Route 40 that he had wrongfully solicited for himself while he was still employed by Knott's.

On the day the trial court issued the injunction, Azbell called J & R Foods and left a message on the telephone answering machine for someone to return his call. After speaking with Jim and Rick Campbell and informing them of the injunction, Azbell and the Campbells agreed that J & R would try to solicit the customers on Route 40 that Azbell had been enjoined from soliciting. J & R hired Azbell as a sales supervisor for some of its other routes. Azbell told J & R the identity of the customers on Route 40 and later gave J & R a written customer list. J & R immediately began servicing the customers on Route 40.

After calling on the customers on Route 40 and unsuccessfully attempting to win them back, Knott's amended its complaint to add J & R as a defendant and to allege civil conspiracy against both Azbell and J & R for conspiring to violate the injunction. All parties agreed that the material facts were undisputed and moved for summary judgment. The trial court granted summary judgment in favor of Knott's, finding that Azbell breached his fiduciary duty and finding both Azbell and J & R, liable for civil conspiracy.

After a hearing on damages, the trial court awarded Knott's $37,526 against both Azbell and J & R for compensatory damages and losses arising from the civil conspiracy. In addition, the trial court awarded Knott's $10,000 in punitive damages and $19,803 in attorneys' fees against both defendants. The trial court further enjoined Azbell and J & R, individually and jointly, from

2

conducting any business on Route 40 for a period of two years. Thereafter, the trial court modified its previous order, enjoining Azbell and J & R from soliciting or servicing only those stores on Route 40 that Azbell had solicited during his employment with Knott's and reducing the duration of the injunction to one year.

Azbell appeals, arguing that the trial court erred in finding a breach of fiduciary duty and civil conspiracy. Alternatively, Azbell appeals the trial court's grant of the injunction and the award of compensatory damages, punitive damages, and attorneys' fees. J & R joins with Azbell in appealing the trial court's finding of a civil conspiracy, the issuance of the injunction, and the award of damages and attorneys' fees. In addition, J & R contends that the trial court erred in failing to consider whether Knott's mitigated its damages. J & R further claims that the trial court erred in finding that the civil conspiracy was the proximate cause of Knott's injuries and in admitting Knott's business records into evidence.

Summary judgment is proper when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.03. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). On a motion for summary judgment, courts must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Id.* at 210-11. In *Byrd*, the Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial. "If he does not so respond, summary judgment . . . shall be entered against him."

*Id.* at 211 (citations omitted). Summary judgment is only appropriate when the case can be decided on the legal issues alone. *Id.* at 210. Because only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *Johnson v. EMPE, Inc.*, 837 S.W.2d 62, 68 (Tenn. App. 1992). Therefore, our review of a trial court's order granting summary judgment is *de novo* on the record before this Court. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).

On appeal, Azbell argues that the trial court erred in finding that he breached his duty of loyalty as an employee by soliciting customers while employed by Knott's.

3

During Azbell's employment with Knott's, there was no agreement between the parties restricting Azbell's ability to compete with Knott's upon termination of his employment. Likewise, there was no agreement regarding Azbell's use of information such as the identity of Knott's customers. Azbell was an employee at will, free to terminate his employment and free to compete with Knott's upon termination of his employment. *See* Restatement (Second) of Agency § 396(a). It is undisputed that Azbell made no actual sales to Knott's customers until after his employment with Knott's ended.

During the employment relationship, an employee has a fiduciary duty of loyalty to the employer. The employee must act solely for the benefit of the employer in matters within the scope of his employment. The employee must not engage in conduct that is adverse to the employer's interests. *See* 27 Am Jur 2d *Employment Relationship* § 216 and cases cited therein.

This duty of loyalty includes, of course, a duty not to compete with the employer during the employment relationship, even in the absence of a noncompetition agreement. *See Eaves v. Hillard Co.*, No. 88-37-II, 1988 WL 49959, at *3 (Tenn. App. May 18, 1988); Restatement (Second) of Agency § 393.

The law distinguishes between solicitation by an employee during the employment relationship and solicitation after the employment has been terminated:

> After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed . . . . Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business.

Restatement (Second) of Agency § 393, cmt. e.

This case centers on whether Azbell's conduct while employed by Knott's amounted to a solicitation of Knott's customers in breach of his common law duty of loyalty. This issue was addressed in *Eaves v. Hillard Co.*:

> Also, an employee not bound by covenant, and absent any breach of trust, may anticipate the future termination of employment and, while still employed, make arrangements for some new employment by a competitor, or the establishment of his own business in competition with his employer. However, he may not solicit his employer's customers for his own benefit, before he has terminated his employment. This would constitute a breach of the undivided loyalty which the employee owes to his employer while he is still employed.

4

*Eaves*, 1988 WL 49959, at *3 (citing *United Bd. & Carton Corp. v. Britting*, 164 A.2d 824, 828 (N.J. Super. Ct. Ch. Div. 1959), *aff'd*, 160 A.2d 660 (N.J. Super. Ct. App. Div. 1960) (emphasis omitted)). In *Eaves*, two employees sued their former employer for breach of an oral employment agreement. *Id.* at *1. The employer filed a counterclaim alleging that, during their employment, the employees engaged in unfair competition and breached their duty of loyalty by operating a competing business and soliciting the employer's customers. *Id.* To determine whether there had been a breach of the duty of loyalty, the court examined the conversations that the two employees had with two of their employer's largest customers. *Id.* at *2. The court noted that an employee stated to one customer, "I'm going to start my new business and I want you to go bring your business with me." *Id.* To another customer, an employee said, "I'm leaving. I'm going to form my new company. I want your business." *Id.* The Court concluded that the employees wrongfully solicited the employer's customers and breached their fiduciary duties. *Id.*

In another unpublished case, *Baker v. Battershell*, Madison Equity No. 5, 1986 WL 7602 (Tenn. App. July 9, 1986), this Court addressed whether a travel agency employee, Battershell, breached her duty of loyalty by wrongfully soliciting her employer's customers before leaving the travel agency. *Id.* at *2-4. In *Baker*, during her employment, the employee made plans to leave and open a competing business. *Id.* at *1. She discussed her plans to leave with some of the agency's customers. *Id.* Two of these customers testified about their conversations with Battershell. *Id.* One said that Battershell discussed her reasons for leaving but did not solicit his business. *Id.* The other customer said Battershell talked about her reasons for the move and asked if she would do business with her, but did not ask the customer to follow her. *Id.* Instead Battershell "simply asked how the client felt about the move." *Id.* The trial court found that Battershell had not actively solicited the customers' business. *Id.* at *3. This Court agreed, reasoning that Battershell "merely notified the customers" as to her intentions to leave her employer and to start a competing business. *Id.* at *4. Accordingly, the Court found that the evidence did not preponderate against the trial court's finding. *Id.*

5

The parties have cited cases from other jurisdictions evaluating whether conversations of current employees with customers constituted active solicitation or merely preparation for post-employment competition. In *Nilan's Alley, Inc. v. Ginsburg*, 430 S.E.2d 368 (Ga. Ct. App. 1993), the employee asked his employer's customers if they would consider doing business with him if he were to leave and form his own business. *Id.* at 369. The court noted that the employee's conversations were "brief, non-specific, and strictly hypothetical" and found that they were not a breach of his fiduciary duty. *Id.* at 370. In *Sanitary Farm Dairies, Inc. v. Wolf*, 112 N.W.2d 42 (Minn. 1961), a salesman discussed his intentions to leave with some of his employer's customers. *Id.* at 48. In the last few days of his employment, the salesman advised approximately half of his customers that he would return later in the week to solicit their business on his own behalf. *Id.* The court noted that although "an employee may take steps to insure continuity in his livelihood in anticipation of resigning his position, he cannot feather his own nest at the expense of his employer while he is still on the payroll." *Id.* The court reasoned that an employee is not furthering his employer's interests by suggesting that its customers should transfer their business elsewhere in the immediate future. *Id.* at 48-49. Therefore, the court concluded the salesman's actions amounted to wrongful solicitation. *Id.* at 50.

In this case, Azbell admits that he told customers, "I'm going to be going into business for myself here in a couple of weeks and I would appreciate you doing some business with me." Azbell states that "I just told some of the customers that I was going to be leaving Knott's and when I came back in a week or so, I would be in business for myself and I would appreciate them buying from me." He admits, "[Y]es, I did ask for their business." Moreover, he assured the customers that he would provide the same products as Knott's at the same prices.

Azbell's conversations with customers went beyond merely notifying Knott's customers of his intentions or posing "brief, non-specific, strictly hypothetical" queries. He asked for their business and even assured them he could supply the same products at the same prices as Knott's. This is active solicitation. Azbell's conduct was a breach of his fiduciary duty to his employer to refrain from actions adverse to the employer's interests and, in particular, the duty not to compete with the employer during the employment relationship, even in the absence of a noncompetition agreement. *See Eaves*, 1988 WL 49959, at *3; Restatement (Second) of Agency § 393. Accordingly, we affirm the trial court's order granting summary judgment on this issue.

Azbell and J & R argue that the trial court erred in granting summary judgment as to the existence of a civil conspiracy to violate the injunction. A civil conspiracy is a " 'combination between two or more persons to accomplish a purpose not in itself unlawful by unlawful means.' " *Dale v. Thomas H. Temple Co.*, 186 Tenn. 69, 208 S.W.2d 344, 347 (1948) (quoting *McKee v. Hughes*, 133 Tenn. 455, 459, 181 S.W. 930 (1915)). "The essence of a civil conspiracy is concert or combination to defraud or cause other injury to person or property, which results in damage to person or property to the plaintiff." *Kirksey v. Overton Pub., Inc.*, 739 S.W.2d 230, 236 (Tenn. App. 1987). The elements of civil conspiracy are "common design, concert of action, and an overt act." *Id.* (citing *Koehler v. Cummings*, 380 F. Supp. 1294, 1313 (M.D. Tenn (1974)). In addition, "the primary purpose of the agreement must be to cause injury to another; incidental injuries resulting from a pursuit of the parties' own fair interest are not actionable." *National Med. Care, Inc. v. Gardiner*, No. 85-154-II, 1986 WL 3157 (Tenn. App. March12, 1986) (citing 16 Am. Jur. 2d *Conspiracy* § 49); *see also Smoky Mountains Beverage Co. v. Anheuser-Busch, Inc.*, 182 F. Supp. 326, 332-33 (E.D. Tenn. 1960) (noting that the essence of a civil conspiracy is an agreement between two or more persons to do injury to another person). In addition, *see Ungaro v. Desert Palace, Inc.*, 732 F.Supp. 1522, 1532 (D. Nev. 1989) ("An act may also be the basis for a civil conspiracy when, although done without a direct intention to injure another, it is 'done to benefit the conspirators, [and] its natural and necessary consequence[] is . . . the oppression of individuals.' ") (citation omitted).

In this case, Knott's amended complaint alleged that Azbell and J & R conspired "for the purpose of subverting, avoiding, and violating the injunction." Therefore, the alleged underlying unlawful act to be determined in this case is whether J & R and Azbell conspired to violate the injunction against Azbell.

In the absence of any injunction, J & R was, of course, free to compete with Knott's for customers along Route 40 or anywhere else. Even after the injunction was issued, J & R remained free to compete with Knott's; the injunction did not entitle Knott's to have all competition for those customers eliminated.

In this case, the trial court ordered the following:

. . . Defendant [Azbell] is hereby restricted from continuing to do business with the places of business that he solicited while in the employ of the Plaintiff and, further, that no other person may service the aforementioned customers in concert or participation with the Defendant, BILLY L. AZBELL, for the benefit of BILLY L.

7

AZBELL.

Therefore, although J & R was free to compete with Knott's, the injunction prohibited J & R from servicing the customers "in concert or participation with . . . Azbell, for the benefit of . . . Azbell." *See also* Tenn. R. Civ. P. 65.02(2) (providing that injunctions are "binding upon the parties to the action, their . . . agents . . . and upon other persons in active concert and participation with them who receive actual notice").

On the day the injunction was issued, Azbell called Jim and Rick Campbell at J & R and informed them of the injunction. As a result of their conversations, Azbell immediately became employed by J & R, working routes other than Route 40, and J & R received from Azbell a list of the customers he serviced along Route 40. Although there is no proof that the list of customers was confidential, it was evidently of value, because Azbell described at least one potential customer on Route 40 as not being "a stop I really wanted to fool with." Azbell's being hired in the same conversation gives the appearance of a quid pro quo. Under these circumstances, it is apparent that J & R acted "in concert or participation with" Azbell and that Azbell benefitted by becoming immediately employed by J & R.[1]

Under our case law, however, the primary purpose of a civil conspiracy must be to cause injury to another. In its amended complaint, Knott's alleged that J & R and Azbell conspired to violate the injunction and "to damage [Knott's] by depriving it of business unlawfully taken from it by Azbell." In its motion for summary judgment, however, Knott's noted that the owners of J & R stated that soliciting the customers on Route 40 after the trial court issued the temporary injunction "was a business decision." Therefore, there appears to be a genuine issue as to whether the primary purpose of the actions of Azbell and J & R were to cause injury to Knott's. The primary purpose of the alleged conspiracy is, of course, a material fact. Consequently, Knott's failed to carry its burden as the moving party, and the trial court erred in granting summary judgment on the issue of civil conspiracy. Accordingly, we reverse the trial court's order granting summary judgment in favor of Knott's on this issue.

---

[1]It should be noted that the trial court was not presented with the issue of whether Azbell or J & R was in contempt of court for violation of the injunction; consequently, we do not address that issue.

8

Both J & R and Azbell have appealed the issuance of the injunction; however, we note that the injunction has lapsed and that the issue is now moot. *See Federated Mut. Implement & Hardware Ins. Co. v. Johnson*, 53 Tenn. App. 288, 298-99, 382 S.W.2d 214, 218 (1964). Our ruling regarding civil conspiracy pretermits the issues raised by J & R regarding mitigation of Knott's damages and admission of Knott's business records as evidence.

The trial court awarded compensatory and punitive damages against both defendants. The award was based, at least in part, on the finding of a civil conspiracy. The award of damages against Azbell is reversed and remanded for trial on the allegations of civil conspiracy. As to Azbell, if it is ultimately determined that the elements of a conspiracy are not met in this case, the award of damages must be reconsidered to determine the amount caused by Azbell's breach of his duty of loyalty. The award of damages against J & R is reversed and remanded for trial on the civil conspiracy allegation.

The trial court also found both Azbell and J & R liable for Knott's attorneys' fees. "The general rule in Tennessee is that attorney's fees may not be recovered unless provided for by statute or by contract between the parties." *Fifth Third Co. v. Mooreland Estates Homeowners Ass'n*, 639 S.W.2d 292, 298 (Tenn. App. 1982). While there are a few exceptions to this public policy, no such exceptions are applicable in this case. *See id.* (providing an exception for when there are funds before the court that have been preserved by a party). Accordingly, the award of attorneys' fees is reversed.

In sum, the trial court's order granting summary judgment against Azbell on the issue of breach of the duty of loyalty is affirmed. The trial court's entry of summary judgment against Azbell and J & R on the issue of civil conspiracy, and consequently the award of compensatory and punitive damages, are reversed and remanded for further proceedings consistent with this Opinion. The award of attorneys' fees against Azbell and J & R is reversed. Costs on appeal are taxed equally to Appellant and Appellees, for which execution may issue if necessary.

_____**HOLLY KIRBY LILLARD, J.**

**CONCUR:**

_____
**W. FRANK CRAWFORD, P. J., W.S.**

_____
**ALAN E. HIGHERS, J.**